IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JESUS LEMUS

          Plaintiff,

                                       3:10-cv-01071-PK

                                       FINDINGS AND
v.                                    RECOMMENDATION

TIMBERLAND APARTMENTS,
L.L.C.,et al.
                   Defendants.

PAPAK, Judge:

      Plaintiff Jesus Lemus brings this action to recover unpaid wages arising out of his alleged

joint employment as a construction worker by defendants Timberland Apartments, LLC

("Timberland" or "Timberland Apartments"), W.R. Townhomes F, LLC ("WR Townhomes F"),

Polygon Northwest Company LLC ("Polygon Northwest"), J.C. Builders, Inc. ("JC Builders"),

Page 1 - FINDINGS AND RECOMMENDATION

and Olympic Framing, LLC ("Olympic Framing").[1] Lemus asserts violations of the Fair Labor

Standards Act, 29 U.S.C. § 206(a)(1), 207(a)(1), and several Oregon wage laws, Or. Rev. Stat. §

653.025, 653.261, and 652.150, against all defendants as well as breach of contract against JC

Builders.  Lemus previously dismissed his claims against JC Builders and Olympic Framing after

reaching a settlement with those parties, leaving only the federal and state wage law claims

presently before the court.[2]  (#55.)  This court has jurisdiction under 29 U.S.C. §216(b) and 28

U.S.C. §1337 for the Fair Labor Standards Act claims and supplemental jurisdiction under 28

U.S.C. § 1367 for Oregon law claims.  Now before the court is Lemus' motion for leave to file a

second amended complaint (#59) removing Polygon Northwest as a defendant and replacing it

with PNW Home Builders, LLC and PNW Cascadian Company, LLC, two other entities

associated with the family of entities grouped under the Polygon Northwest Company "brand."

Also before the court is Lemus' motion for partial summary judgment[3] (#62) and a motion for

summary judgment by defendants Timberland Apartments, WR Townhomes F, and Polygon

Northwest (#67.)  For the reasons discussed below, Lemus' motion to amend, Lemus' motion for

---

[1] Defendants Timberland Apartments and WR Townhomes F were two single-purpose entities created to serve as the developer/general contractor of the two projects at issue in this case, the Timberland Apartments and the WR Townhomes F, sometimes called "Urban Flats." Defendant JC Builders was a framing subcontractor hired by the two entities and Olympic Framing is JC Builders' successor in interest.

[2] Lemus received $3,500 from JC Builders pursuant to a settlement agreement.  (Lemus Decl., #87, ¶10.)

[3] Lemus styles his motion as one for partial summary judgment only because his current first amended complaint includes one claim for relief that applies only to defendant JC Builders, which has since been dismissed.  Lemus states that his current motion is intended to resolve this action completely, including his First through Fourth Claims for Relief as against the remaining defendants as well as the defendants he seeks to add through amendment.

Page 2 - FINDINGS AND RECOMMENDATION

partial summary judgment, and defendants' motion for summary judgment should all be granted

in part and denied in part.

## BACKGROUND

### I.    Overview

The Polygon Northwest Company brand ("Polygon") refers to a family of companies that

develops real estate in Washington and Oregon.  In general, employees of PNW Homebuilders

Company, LLC ("PNW Homebuilders"), one of the constituent entities making up Polygon,

identify a property to develop and then set up a single-asset limited liability company to develop

that piece of property.  (Henretty Decl., #61, Ex. 4, at 12-14) (Eadon Dep.).   The single-asset

entity purchases the land, secures financing, constructs residences, sells the residences, services

customers' warranties, and then winds down.  *Id.*  Two of those single-asset entities are

Timberland Apartments and WR Townhomes F, established for development of the Timberland

Apartments project and the Urban Flats project, respectively, both of which are located outside of

Portland, Oregon.

In March and April 2009, JC Builders subcontracted with Timberland Apartments and

WR Townhomes F to provide framing services.[4]  (Erickson Decl., #70, ¶4, Exs. A, B.)  Jean-

Pierre Charpentier, Jr., owner of JC Builders, started that company in September 2008, after

previously operating a construction company employing between three and sixty employees.

(Henretty Decl., #92, Ex. 3 at 31); (Poore Decl., #94, Ex. C at 6-7.)  Before JC Builders

contracted with the Polygon entities, most of its framing business was conducted within 65 to 85

---

[4] JC Builders also contracted for framing on a third Polygon project in Oregon called
Progress Ridge West, which is not at issue in this case.

Page 3 - FINDINGS AND RECOMMENDATION

miles of its home office in Puyallup, Washington.  (Poore Decl., #80, Ex. B at 10-12.)  Signing contracts with Polygon, an established homebuilder in Oregon, allowed Charpentier to expand his business considerably, but also presented new challenges.  *Id.* at 8, 11.  Specifically, Charpentier needed to staff the Polygon projects in Oregon, which he accomplished by bringing existing employees down from Washington and housing them in rented apartments, and also by hiring new employees in the Portland area.  *Id.* at 10, 11.  In April 2009, Jesus Lemus was hired by JC Builders as a framer, starting work on April 21, 2009 at the Timberland Apartment project. (Lemus Decl., #87, ¶¶3,5.)

Once work started on the Polygon projects, it appears that JC Builders was stretched beyond its capacity.  There was a constant turnover of employees at the Oregon sites.  (Henretty Decl., #86, Ex. 1, at 6) (Charpentier Dep.).  Polygon site superintendents thought that JC Builders had too few workers at the projects to complete them on schedule and communicated that fact to Charpentier.  (Henretty Decl., #86, Ex. 3 at 9-11) (Ingebrigtsen Dep.); (Henretty Decl., #86, Ex. 4 at 7-8) (Walther Dep.).  Moreover, JC Builders was not actively seeking other work for the time being because "we were more busy than we cared to be with our present projects . . . ."  (Henretty Decl., #86, Ex. 1 at 31) (Charpentier Dep.).  Indeed, during that time period, JC Builders relied on Polygon projects for 85 percent of its income and only worked on two other smaller projects with other builders.  (Henretty Decl., #92, Ex. 3, at 11) (Charpentier Dep.)

In late May 2009, Timberland Apartments superintendent Kristian Ingebrigtsen was approached by two JC Builders supervisors who told him that they were not being paid. (Henretty Decl., #66, Ex. 3, at 12-14) (Ingerbrigsten Dep.).  On May 22, 2009, JC Builders'

owner met with Polygon's Vice President of Finance and Vice President of Production in

Bellevue, Washington to discuss its difficulty paying its suppliers and employees.  (Henretty

Decl., #66, Ex. 2, at 5, 9) (Ballantyne Dep.).  Polygon wanted to know whether JC Builders was

financially capable of finishing its framing work at the projects in a timely fashion and sought to

obtain information to evaluate whether Timberland Apartments would potentially be exposed to

a risk of liens filed against the project by JC Builders' material suppliers and employees who

were not being paid by JC Builders.  (Landschulz Decl., # 71, ¶3); (Landschulz Decl., #83, ¶5.)

During the meeting, Charpentier provided a list of debts JC Builders owed– including amounts

owed to suppliers and employees– as well as a list of debts others owed to JC Builders.  (Poore

Decl., #80, Ex. C, at 9-10); (Landschulz Decl., #83, ¶4.)  As a result of the meetings, Polygon

issued two check to JC Builders on May 29, 2009 totaling over $100,000.[5]  (Henretty Decl., #66,

Ex. 6, at 2-3) (RFA's No. 6 & 7).  The payments occurred earlier than was required by Polygon's

normal payment schedule with JC Builders.  (Henretty Decl., #66, Ex. 2, at 10.)  As a result of

the meeting, Polygon also required JC Builders to start providing lien releases for each of its

employees verifying that their wages had been paid.  (Poore Decl., #80, Ex. C, at 12-13.)  Indeed,

Charpentier hand delivered these lien releases to Polygon on at least one occasion after the

meeting.  *Id.* at 13.  On the same day Polygon advanced its payments to JC Builders, Lemus

received a single paycheck in the gross amount of $1,313.00.  *Id.* at ¶7.

---

[5] There is some confusion in the record about the nature of these payments.  Polygon Vice
President of Production Gordon Ballantyne testified that Polygon actually issued checks jointly
to JC Builders and JC Builders' employees, as would have been permitted by the subcontract
with JC Builders. (Henretty Decl., #66, Ex. 2, at 9.)  Lemus, however, contends that Ballantyne
was mistaken and that the checks were issued only to JC Builders and not jointly to JC Builders'
employees.

Page 5 - FINDINGS AND RECOMMENDATION

Lemus ended his employment with JC Builders on June 17, 2009. (Lemus Decl., #87, ¶6). Lemus declares that when he stopped working for JC Builders, he was still owed wages for his work at the Timberland Apartments project. *Id.* at ¶8. Lemus stated that between April 21, 2009 and June 17, 2009, he worked 426 hours as a framer at the Timberland Apartment project, 76 hours of which was overtime, but was paid only for 128 hours of work. *Id.* at ¶¶5-7. Lemus also states that JC Builders later gave him $200 towards his unpaid wages. *Id.* at ¶9.

JC Builders, for its part, offers several descriptions of Lemus' work dates and wage history that are both internally inconsistent and contradictory with Lemus' account. Charpentier first stated that Lemus only worked on building number eight at the Timberland Apartments project; he and other workers were removed from that project because "they couldn't complete it or finish it or do it right." (Poore Decl., #80, Ex. B, at 16.) Based on the fact that Lemus and his co-workers took a month to build up to the second floor on that building, Charpentier estimated that Lemus worked at least 160 hours for JC Builders. *Id.* at 16. Yet Charpentier also testified that Lemus worked about 130 hours, based on his receipt of a check for somewhat over $1,300. *Id.* Both these estimates would have Lemus no longer employed by JC Builders in June 2009. A third estimate based on a spreadsheet, prepared by JC Builders' general manager Pierre Chatelaine, indicated that Lemus indeed worked during the first three weeks of June 2009. *Id.* at 57; Ex. 2 at 1. But Charpentier called into question all of these estimates, admitting that he was not sure which dates Lemus worked for JC Builders. (Henretty Decl., #92, Ex. 3, at 61.)

Likewise, there are discrepancies with JC Builders' descriptions of Lemus' pay history. The spreadsheet prepared by Chatelaine indicate that in addition to a payment of $1,313.00, Lemus received a draw of $537.60 and was still owed $102.40. *Id.* at 57-60. Charpentier called

that spreadsheet into question, however, stating that it merely "speculates that [Lemus] was paid $537.60" as a draw and testifying that he could not verify the draw because he did not know the format in which Lemus had been paid.  *Id.* at 60.

Timberland Apartments and WR Townhomes F eventually terminated their respective subcontracts with JC Builders after JC Builders failed to complete its work on time, fell below quality requirements, and failed to show up for work the week of July 13, 2009. (Ingebrigtsen Decl. #73, ¶8); (Mapes Decl., #74, ¶8.)  Timberland Apartments and WR Townhomes F then hired another framing subcontractor, who completed and corrected JC Builders' work at additional cost. (Erickson Decl., # 70, ¶¶6,9).

After being fired by Timberland Apartments and WR Townhomes F, JC Builders did no other work on Polygon projects.  (Henretty Decl., #92, Ex. 3 at 50.)  JC Builders attempted to secure framing contracts from other developers, but was mostly unsuccessful, working on only one small building in Burien, Washington in August 2009.  *Id.*  In September 2009, JC Builders stopped doing business.  *Id.* at 45.  More than 30 workers later claimed they were owed wages from JC Builders for work done on Polygon projects.  (Henretty Decl., #66, ¶12.)

## DISCUSSION

### I.    Motion to Amend

Leave to amend is within the discretion of the trial court, but that discretion "should be guided by the underlying purpose of Rule 15(a) which was to facilitate decisions on the merits, rather than on technicalities or pleadings."  *In re Morris*, 363 F.3d 891, 894 (9th Cir. 2004) (citation omitted).  "A district court may, however, take into consideration such factors as bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether the

party has previously amended his pleadings." *Id.* (citation omitted).  Of these factors, the most important is the potential for prejudice to opposing parties.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971).  While futility alone provides sufficient grounds for denying a motion to amend, *see Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004), undue delay by itself cannot justify denial of a motion to amend.  *See Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999).  "An outright refusal to grant leave to amend without a justifying reason is . . . an abuse of discretion."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1034 (9th Cir. 2008) (citation omitted).

Lemus seeks to amend his complaint to remove Polygon Northwest Company as a defendant and replace it with PNW Home Builders, the Polygon entity that maintained full-time employees, and PNW Cascadian Company, the "paymaster" entity that paid those employees as well as subcontractors, including JC Builders.  Lemus argues that PNW Home Builders and PNW Cascadian Company, along with the respective single-purpose LLCs Timberland Apartments and WR Townhomes F, effectively acted as a single enterprise in developing the two projects and are therefore also liable to Lemus as joint employers under the expansive and non-technical definition of "employer" in the FLSA.  More pointedly, Lemus fears that without these defendants, he will be prevented from using certain conduct by various Polygon entities to illustrate the true economic reality of the employment relationship between Lemus and the named single-asset entities.

Lemus' concern is unfounded.  During oral argument, defendants stipulated in open court that even though the relevant individuals were technically employees of PNW Home Builders and paid by PNW Cascadian, for the purposes of all events at issue in this suit they acted as

Page 8 - FINDINGS AND RECOMMENDATION

representative agents for Timberland Apartments and WR Townhomes F, the single-asset

entities.  Moreover, neither Timberland Apartments nor WR Townhomes F  attempt to defeat

Lemus' summary judgment by arguing that certain activity, while indicative of a joint

employment relationship, are attributable to other Polygon entities not named as defendants.

Given defendants' in-court stipulation and their acceptance that the single-purpose entities are

wholly responsible for all activities relating to these projects, I find Lemus' proposed amendment

adding PNW Home Builders and PNW Cascadian Company to be futile.  By contrast, Lemus'

proposal to remove Polygon Northwest Company as a defendant is proper.  Accordingly, Lemus'

motion to amend should be granted only as to removing Polygon Northwest Company and

Lemus' motion for partial summary judgment should be construed as only against defendants

Timberland Apartments and WR Townhomes F.

## II.     Cross Motions for Summary Judgment

Both parties move for summary judgment on Lemus' federal and state minimum wage

and overtime claims.  As an initial matter, I agree with defendants that WR Townhomes F is an

improper defendant and should be dismissed because Lemus worked only on the Timberland

Apartments project, not the WR Townhomes project.[6]  Thus, the primary dispositive issue on

these cross motions is whether Timberland Apartments and JC Builders were joint employers of

Lemus under the FLSA and Oregon wage laws.[7]  If an entity is deemed an employer under the

---

[6] Lemus now argues that he may have worked at WR Townhomes (know as "Urban
Flats") as well as Timberland Apartments because a JC Builder's payroll spreadsheet identifies
Lemus' worksite as "Timberland/UF."  This is pure speculation, especially in light of Lemus'
own declaration stating that he only worked at Timberland Apartments.

[7] For simplicity I still refer to Timberland Apartments, LLC as "Polygon" throughout the
rest of this opinion, even while recognizing that Timberland Apartments is an independent entity

Page 9 - FINDINGS AND RECOMMENDATION

FLSA, it will also be an employer under Oregon wage laws. *See Sanchez-Calderon v. Moorhouse Farms*, 995 F. Supp. 1098, 1104 n.5 (D. Or. 1997) ("the same analysis that applies to the FLSA will hold true under the Oregon wage laws, because the Oregon act is patterned after the FLSA"). Thus, I focus my analysis only on the FLSA. After examining the relevant factors identified by the Ninth Circuit in light of the specific facts of this case, I conclude that Polygon served as Lemus' joint employer.

### A. Relevant Case Law

Whether an entity is an employer under the FLSA is a question of law, assuming the underlying facts are not disputed. *See Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983). In *Gonzales v. Sterling Builders, Inc.*, 2010 WL 1875620 (D. Or. May 6, 2010), a recent case similarly addressing whether construction framers were jointly employed by a general contractor, Judge Brown aptly summarized the legal context for this issue:

> Congress enacted the FLSA to remedy "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well being of workers." 29 U.S.C. § 202(a). The Supreme Court has made clear that the FLSA is to be construed expansively in favor of coverage because broad coverage is essential to accomplish the goals of this remedial legislation. *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296-97, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). *See also Hale v. State of Ariz.*, 967 F.2d 1356, 1362 (9th Cir.1992) (same).
>
> The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The Supreme Court has described the FLSA's definition of an employee as "the broadest definition that has ever been included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 89 L.Ed. 301 (1945)(internal quotations and citation omitted). The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA defines " 'employ' expansively to mean 'suffer or permit to work.' " *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (quoting 29 U.S.C. §§ 203(e), (g)). "[T]he words 'suffer' and 'permit' as used in

and the relevant defendant in this action.

the statute mean with the knowledge of the employer." *Forrester v. Roth's IGA Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir.1981)(internal quotations and citation omitted). The Supreme Court has emphasized the "striking breadth" of the definition of "employee" and has noted it "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co.*, 503 U.S. at 326.

Under the FLSA "[n]either the common law concepts of 'employee' and 'independent contractor' nor contractual provisions purporting to describe the relationship are determinative of employment status." *Nash v. Res., Inc.*, 982 F.Supp. 1427, 1433 (D.Or.1997)(citing *Real v. Driscoll*, 603 F.2d 748, 754-55 (9th Cir.1979)). "[D]etermination of whether an employer-employee relationship exists does not depend on 'isolated factors but rather upon the circumstances of the whole activity.' " *Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir.1983)(quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)). "The touchstone is 'economic reality.' " *Id.* (quoting *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)).

*Gonzalez*, 2010 WL 1875620, at *3–4.

Indeed, the Ninth Circuit has adopted the so-called "economic reality" test to determine whether multiple entities are joint employers of a single employee under the FLSA. *See Bonnette*, 704 F.2d at 1470. In *Bonnette*, the Ninth Circuit addressed whether state and county welfare agencies were joint employers of in-home "chore workers" who provided services to disabled public assistance recipients. The Court applied four factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* Although the public assistance recipients selected the chore workers themselves, the agencies exercised complete economic control over the workers, paying them directly, dictating how many hours they worked and what tasks they performed, and intervening when problems arose with the public benefits recipients. *Id.* The Court observed that the "economic reality" was that the agencies employed the chore

workers to perform social services for the benefit of the recipients.  *Id.*

In subsequent cases, the Ninth Circuit has expanded and refined the "economic reality" test of joint employment.  In *Torres-Lopez v. May*, 111 F.3d 633 (9th Cir. 1997), the Court considered whether a farmer and a farm labor contractor were joint employers of laborers under the FLSA and the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), both of which define joint employment identically.  There, the Court acknowledged the "economic reality" test set out in *Bonnette*, and followed *Bonnette's* instruction to consider all factors "relevant to the particular situation" by considering a set of factors found in AWPA regulations and a set of non-regulatory factors derived from Supreme Court and Ninth Circuit cases.

*Torres-Lopez v. May*, 111 F.3d at 639-640.  The regulatory factors were:

> (1) The nature and degree of control of the workers;
> (2) The degree of supervision, direct or indirect, of the work;
> (3) The power to determine the pay rates or the methods of payment of the workers;
> (4) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;
> (5) Preparation of payroll and the payment of wages.

*Id.* at 639-640.  The non-regulatory factors were:

> (1) whether the work was a specialty job on the production line;
> (2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;
> (3) whether the premises and equipment of the employer are used for the work;
> (4) whether the employees had a business organization that could or did shift as a unit from one worksite to another;
> (5) whether the work was piecework and not work that required initiative, judgment or foresight;
> (6) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;
> (7) whether there was permanence in the working relationship; and
> (8) whether the service rendered is an integral part of the alleged employer's business.

*Id.*

Page 12 - FINDINGS AND RECOMMENDATION

Analyzing the first several regulatory factors, the Court found that the farmer controlled the overall harvest schedule and the number of workers needed by staggering planting dates and advising the labor contractor when to begin harvesting. *Id.* at 642. The farmer also exercised a substantial degree of supervision of the laborers, reserving the right to inspect their work, maintaining a daily presence in the field, and communicating with the labor contractor several times a week. *Id.* The Court acknowledged that even the farmer's *indirect* control of the laborers demonstrated a joint employment relationship. *Id.* at 642-643. The Court found that the second set of regulatory factors dealing with payment and payroll also indicated a joint relationship even though the farmer did not prepare the payroll or pay the laborers' wages directly, since the farmer had some role in determining pay rates for laborers, including increasing the labor contractor's compensation to allow payment of higher wages during the more difficult first picking. *Id.* at 643.

The Court also determined that all but one of the non-regulatory factors suggested joint employment. First, picking was like a "specialty job on the production line" because it constituted "one small step in the sequence of steps" taken by the farmer to grow the cucumbers and prepare them for processing by a cannery. *Id.* Second, there were no "material changes" in the oral contracts between the farmer and labor contractor, which were standard for the industry and involved little negotiation. *Id.* Third, the laborers worked on land leased by the farmer and only provided their own simple, hand-held tools. *Id.* at 644. Fourth, the laborers lacked a business organization that could shift from one farm to another because the labor contractor selected a crew from among the workers who showed up at the farm after hearing that cucumbers were ready for harvest. *Id.* Fifth, picking cucumbers was "piecework" requiring no special skill

or insight. *Id.* Sixth, because the laborers worked at a piece-rate, they had no opportunity for profit of loss depending upon their managerial skill. *Id.* Seventh, the farm workers had no permanent working relationship with the farmer because they harvested for only 32 days, which did not support the conclusion that they were jointly employed. Finally, the laborers' picking was an integral part of the farmer's business, without which the farmer would not have been able to realize any economic benefit of his investment. *Id.* Consequently, the Court held that the farmer was a joint employer under the FLSA and AWPA. *Id.*

More recently, in *Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004), the Ninth Circuit addressed whether Air France was a joint employer of employees of several ground service companies at SFO for the purpose of the FMLA. Because the FMLA employs a number of definitions from the FLSA and because the FMLA's joint employer regulation mirrored the wording of the FLSA joint employer regulation, the Court applied the jurisprudence developed under the FLSA and AWPA in *Bonnette* and *Torres-Lopez*. *Moreau*, 356 F.3d at 946-947. The Court first looked to the *Bonnette* factors, recognizing that they "roughly correspond" with the regulatory factors used in *Torres-Lopez*. Although Air France scheduled flights in and out of the airport, it did not hire or fire ground handling company employees, determine their rate or method of pay, keep their employment records, or control their work schedules, conditions, or requirements for payment, and thus lacked any direct control over the ground workers. *Id.* at 950. Air France exercised some indirect supervision of ground workers, checking to ensure its standards were satisfied by the service provider. *Id.* at 951. The Court noted, however, that this indirect supervision was purportedly to ensure compliance with safety and security regulations governing the airline and therefore was "qualitatively different" from the supervision in *Torres-*

Page 14 - FINDINGS AND RECOMMENDATION

*Lopez*. *Id.* The Court also referred to the *Torres-Lopez* non-regulatory factors, many of which indicated no joint employment, and also considered other aspects that were not implicated by either the *Bonnette* or *Torrez-Lopez* factors. *Id.* at 952-953 (calling the district court's focus on the four *Bonnette* factors "a bit narrow" and reviewing the "entire relationship in its totality"). Ultimately, the Court concluded that Air France was not a joint employer of the ground handling service company employees.

Two cases in this district analyze the issue of joint employment under the FLSA in the construction industry. In *Gonzales v. Sterling Builders, Inc.*, 2010 WL 1875620 (D. Or. May 6, 2010), Judge Brown addressed whether a general contractor was a joint employer of framers hired by a sub-sub-contractor.[8] Judge Brown relied on the list of regulatory and non-regulatory factors from *Torres-Lopez* to guide her analysis. There, the regulatory factors all favored the conclusion that there was no joint employment: plaintiffs conceded that the general contractor had no power to hire and fire them, did not maintain their employment records, and did not directly set their work schedules. *Id.* at *4-5. Moreover, Judge Brown rejected the notion that the general contractor indirectly controlled plaintiffs' work conditions by setting the overall project work schedule, especially because plaintiffs were several steps removed from the general contractor. *Id.* Judge Brown also found that many of the non-regulatory factors were either neutral or favored finding no joint employment: framing was not akin to a specialty job on a production line because it was not a high-skilled occupation; there was no evidence as to whether the contracts passed without material changes; there was no evidence as to whether the general

---

[8] Defendant LC Construction, the general contractor, subcontracted its framing to PIC Construction, which in turn subcontracted the work to Hammer Construction, which employed plaintiffs. 2010 WL 1875620, at *1.

contractor owned the premises or whether the plaintiffs used the contractor's tools; and plaintiffs' relationship with the general contractor lasted only three months during the single project. *Id.* at *6-8. On the other hand, several factors favored plaintiffs: they did not have a shifting business unit because they worked together again only once for a few months; their framing was piece work and required no special judgment or management skill; and their contribution was an integral part of home construction. *Id.* Judge Brown granted defendants' summary judgment motion, concluding that even though the general contractor may have occasionally been on site, a jury could not find that he supervised or controlled the laborers' employment. *Id.* at *8.

Judge Acosta reached the opposite result in *Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037 (D. Or. 2010), denying defendant's motion for summary judgment because there was sufficient evidence for a jury to find that a drywall contractor and its drywall subcontractor jointly employed drywall laborers. Analyzing the *Bonnette* factors, Judge Acosta noted that although the contractor did not directly control the laborers' working conditions, they assigned them to specific project sites, dictated which materials they would use, provided those materials, required them to present proof of their work to be paid, briefly visited the project sites to provide supervision and instruction, reserved the right to back charge for work done incorrectly, and retained the right to remove laborers from a project without pay under certain circumstances. *Id.* at 1062-1063. Further, the laborers negotiated pay rates directly with the contractor, sometimes resolved pay disputes with the contractor, and received pay from both the contractor and other third parties. *Id.* at 1063. The contractor also maintained employment records for a few laborers and required laborers to track their time on worksheets and return them to the contractor. *Id.*

Page 16 - FINDINGS AND RECOMMENDATION

Judge Acosta also went on to examine the *Torres-Lopez* non-regulatory factors, but used those factors to determine whether the laborers were independent contractors or employees, not to analyze the issue of joint employment.

**B.      The Appropriate Test**

As a threshold question, the court must determine the appropriate test to analyze joint employment.  Defendants urge this court to apply only the four *Bonnette* factors and to ignore both regulatory and non-regulatory factors laid out in *Torres-Lopez*.  Although defendants argue generally that all of the *Torres-Lopez* regulatory factors are inapplicable here because they can only be used in AWPA case like *Torres-Lopez*, defendants mainly oppose using the *Torres-Lopez* regulatory factor that analyzes the putative employer's "indirect control" over the plaintiff. By contrast, Lemus argues that the court should apply both the regulatory and non-regulatory factors from *Torres-Lopez*, as Judge Brown did in *Gonzales*, and rely significantly on the "indirect control" aspect of that analysis.

Case law suggests that it is technically more correct to apply the four *Bonnette* factors instead of the five *Torres-Lopez* regulatory factors where, as here, the plaintiff was clearly employed by an intermediary company.  *See Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037, 1062 (D. Or. 2010) ("The *Bonnette* economic reality factors are applicable in circumstances of 'vertical' joint employment, that is, where a company has contracted for workers who are directly employed by an intermediary company.") (quoting *Chao v. A–One Med Servs. Inc.*, 346 F.3d 908, 911 (9th Cir. 2003)).  The difference between these two approaches is negligible, however, since the *Bonnette* factors "roughly correspond to the *Torres-Lopez* regulatory factors." *Moreau v. Air France*, 356 F.3d 942, 950 (9th Cir. 2004) (internal quotation

omitted).  Moreover, I disagree with Polygon's argument  that the "indirect control" factor is only

applicable in AWPA cases.  In fact, many of the cases relied upon by Polygon are non-AWPA

cases where the courts investigate indirect control.  *See Moreau*, 356 F.3d at 951 (FMLA case,

considering indicia of indirect supervision, but determining that the defendant's indirect control

was "qualitatively different" from the indirect control exhibited in *Torres-Lopez*); *Jacobson v.

Comcast Corp.*, 740 F. Supp. 2d 683, 691 (D. Md. 2010) (FLSA case, analyzing whether cable

company's monitoring of the work of subcontracted installation technicians to ensure compliance

with company standards amounts to control of technicians, even though cable company "does not

dictate the technicians' working conditions");  *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154,

1160 (C.D. Cal. 2003) (FLSA case, considering whether clothing company's hired auditor's

access to subcontractor's payroll records constituted an exercise of "either direct or indirect"

control).  Moreover, the text of the FLSA and its implementing regulations both require courts to

consider indirect control in determining whether an entity is an employer.  *See* 29 U.S.C. §

203(d) (Employer includes "any person acting directly or *indirectly* in the interest of an employer

in relation to an employee.") (emphasis added); 29 C.F.R. § 791.2(b) (joint employment

relationship exists "Where one employer is acting directly or indirectly in the interests of the

other employer (or employers) in relation to the employee.").  Consequently, I consider

Polygon's exertion of indirect control over Lemus, which becomes a crucial factor in the

analysis.

Defendants also hope to avoid application of the *Lopez-Torres* non-regulatory factors,

although they contend that even if the court looked to those factors, it should still find no joint

employment relationship.  Many cases, however, apply both the *Bonnett* regulatory factors and

the *Torres-Lopez* non-regulatory factors.  *See, e.g., Moreau*, 356 F.3d at 950-952; *Zhao*, 247 F.

Supp. 2d at 1157-1161.  Likewise, I apply the *Torres-Lopez* non-regulatory factors, but I do not

hew to them so mechanistically as to lose sight of the economic reality of the relationship

between Lemus, JC Builders and Polygon.  *See* 29 C.F.R. § 825.106(b) ("A determination of

whether or not a joint employment relationship exists is not determined by the application of any

single criterion, but rather the entire relationship is to be viewed in its totality."); *Moreau,* 356

F.3d at 950 (even when applying the *Torres-Lopez* non-regulatory factors, the analysis must be

based on the totality of the circumstances and the economic reality of the situation).

    **C.**    **Applying the *Bonnette* Factors**

        **1.**    **Power to Hire and Fire**

It is undisputed that Polygon's contract with JC Builders included a clause reserving the

right to fire JC Builders' employees if they smoked or chewed tobacco within any building, or if

they drank alcohol or consumed non-prescribed drugs anywhere on the project site. (Henretty

Decl., #66, Ex. 1 at 2) (Subcontract, ¶ C.6).   It is also undisputed that although Polygon did not

have the right to terminate JC Builders employee for other reasons, Polygon could also remove a

JC Builders employee from the job site if, for example, the employee was a safety hazard. (Poore

Decl., #69, Ex. B, at 10-11) (Charpentier Dep.).  Unlike in *Moreau* and *Gonzalez*, where the

putative joint employers had absolutely no power to hire or fire plaintiffs, here Polygon retained

both a limited right to fire JC Builders' employees for specific violations of Polygon policy and a

more general right to remove JC Builders' employees from the job site for safety concerns, a

sanction somewhat equivalent to firing here where Polygon's jobs constituted the vast majority

of JC Builders' work.  Thus, this factor weighs in favor of finding a joint employment

Page 19 - FINDINGS AND RECOMMENDATION

relationship.

> **2.      Supervision and Control of Work Schedules or Conditions of**
>
> **Employment**

Even though Polygon did not directly dictate JC Builders' work schedules or conditions of employment, various aspects of its management and supervision indirectly had a similar effect.   Polygon exerted indirect control through a combination of setting the master construction schedule, dictating permissible work hours, providing and managing the flow of necessary construction materials, and supervising JC Builders' framing work in a manner that undercut JC Builders' ability to manage the daily tasks of its employees.

> **a.      Overall Construction Schedule**

There is no dispute that Polygon set the master construction schedule at Timberland Apartment project.  Setting a project's master schedule alone does not show the necessary authority to control work conditions. *See Gonzales v. Sterling Builders, Inc.*, 2010 WL 1875620, at *5 (D. Or. May 6, 2010) ("authority to set an overarching start and finish date for a construction project does not establish Defendants had the authority or ability to supervise or to control work conditions").  Nevertheless, Polygon's power to set the master construction schedule reinforces the notion that it possessed a great measure of indirect control, especially when viewed in conjunction with the other indicia of indirect control described below.

> **b.      Worksite Hours**

Polygon exerted indirect control over JC Builders' employee work schedules by limiting job site working hours.  Polygon declares that work site hours were dictated by noise restrictions in the local jurisdiction, not by its own policies, but the record undercuts that assertion.

Page 20 - FINDINGS AND RECOMMENDATION

(Erickson Decl., #82, ¶3.)  In fact, although the City of Beaverton restricted work hours from 7:00 AM to 7:00 PM, Polygon did not allow work until 8:00 AM on Saturdays to give neighbors "an extra hour of sleep."  (Henretty Decl., #91, Ex. 1, at 7) (Baker Dep.).  Moreover, even though the City of Beaverton allowed work on Sundays, Polygon had a "site rule" prohibiting subcontractors from working on Sundays.  *Id.*, Ex. 1 at 8.  Thus, Polygon's policies– not local ordinances– restricted JC Builders' working hours.

### c.    Materials

In *Chao*, Judge Acosta relied on the fact that the putative joint employer "controll[ed] all decisions about what materials are used for the project [and] provid[ed] those materials" in finding that the second *Bonnett*e factor favored a finding of joint employment.  709 F.Supp.2d at 1062.  Here, as in *Chao*, Polygon's role providing almost all construction materials and dictating the delivery schedule of those materials gave it a manner of indirect control over JC Builders employees' daily tasks.  Polygon provided the vast majority of the materials used in framing, namely the lumber, while JC Builders provided the nails and glue, comprising about 2% of necessary materials. (Henretty Decl., #86, Ex. 6, at 7-8) (Baker Dep.)  Moreover, Polygon subcontracted with a lumber supplier who determined the type and quantity of lumber needed at the site, and Polygon dictated when this lumber would be delivered.  (Poore Decl., #80, Ex. D, at 4-6) (Baker Dep.).  Thus, it is reasonable to infer that Polygon was responsible for at least some of the changes in JC Builders' working conditions and daily schedule caused by a lack of suitable lumber for framing.  Indeed, Charpentier testified that when Polygon failed to order materials in time, which occurred "frequently," Polygon site superintendents would verbally direct JC Builders to divert its employees to other available work, causing a drop in productivity.

(Henretty Decl., #86, Ex. 1, at 17,19) (Charpentier Dep.).  Although Charpentier perceived that Polygon superintendents were only trying to "advance their project," not "direct our company or manipulate us into a direction," the shifting of workers due to missing materials caused JC Builders to make multiple trips to a single building instead of just one.  *Id.*, Ex. 1 at 19-20. Moreover, the lack of materials sometimes prevented JC Builders from completing part of a Quality Assurance (QA) punch list.  *Id.* at 20.  Thus, Polygon's role in scheduling material deliveries indirectly impacted JC Builders employees' working conditions and schedule, forcing them to switch among buildings and decreasing their productivity.

### d.    Continuous On-Site Supervision and Correction

It is clear that JC Builders maintained some degree of control over its workers, setting its crews' schedules to meet the master construction schedule, deciding how many crews to send to a particular job, and having its project leads answers workers' questions.  (Poore Decl., #69, Ex. B. at 21-23) (Charpentier Dep.).  Indeed, Lemus himself went to his crew lead, not Polygon employees, for direction.  (Poore Decl., #69, Ex. A. at 5-6) (responses to Interrogatory 4 and 5). Further, all the evidence in the record suggests that Polygon superintendents gave orders only to JC Builders supervisors, not directly to JC Builders laborers like Lemus.

Nevertheless, the record indicates that Polygon's constant supervision on the job site and Polygon site superintendent's requests to immediately address various framing issues also forced JC Builders to shift its workers throughout the day to address Polygon's concerns.  First, JC Builders' subcontract allowed Polygon to request immediate correction of any of JC Builders' work.  (Henretty Decl., #86, Ex. 8, at 4) (¶ F.3).  This seems to have occurred somewhat frequently.  Polygon's site superintendent at the Timberland Apartments project spent 98 % of

Page 22 - FINDINGS AND RECOMMENDATION

his time on the site observing subcontractor work and Polygon supervisors spoke to JC Builders'

supervisors daily, if not several times per day, about JC Builders' work.  (Henretty Decl., #86,

Ex. 3, at 6,7) (Ingebrigtsen Dep.); (Chatelaine Decl., #88, ¶5).  When a Polygon site

superintendent identified an issue, he expected JC Builders' site supervisor to address the issue

immediately, and frequently told JC Builders that they could not move forward with framing

work or leave for the day until the issue was fixed.[9]  (Chatelaine Decl., #88, ¶6).  Because these

requests were so common, JC Builders set aside time at the end of each day to address items

raised by the Polygon superintendent during the day.  (Chatelaine Decl., #88, ¶7).

 Polygon's requests also caused disruptions in the middle of the workday as well,

requiring JC Builders to make its workers wrap up their tools, move to a different building, and,

for example, make an alteration for a plumber.  (Henretty Decl., #92, Ex. 3, at 16) (Charpentier

Dep.) (describing a typical Polygon's superintendent request as one that JC Builders "give him

manpower").  JC Builders also had to move crews around to redo door heights and make changes

in the framing of the rental office building at Polygon's request.  (Chatelaine Decl., #88, ¶¶10,

12.).  Likewise, Polygon also had JC Builders workers "leapfrogging" from one building to

another because Polygon had not finished pouring the concrete foundations on all the buildings

when JC Builders started work.  (Henretty Decl., #92, Ex. 3, at 9-10) (Charpentier Dep.).  These

requests were completely separate from fixes requested through its Quality Assurance

Inspections, which occurred at specific pre-determined points in the construction process.

(Chatelaine Decl., #88, ¶13); (Henretty Decl., #86, Ex. 2, at 9-10) (Ballantine Dep.).

---

 [9] Polygon disputes that its site superintendents ever prevented JC Builders employees
from leaving for the day until they completed framing tasks. (Ingebrigtsen Decl., #81, ¶7.)

Page 23 - FINDINGS AND RECOMMENDATION

Polygon argues that in large construction projects the general contractor must detect and correct mistakes in subcontractor work early, to encourage job site safety, to ensure buildings comply with specifications, and to prevent costly corrections.  I recognize Polygon's concern, but note that the general contractor may accomplish this goal without dictating the subcontractor's employees' daily tasks.  *See*, *e.g. Quintanilla v. A & R Demolitina, Inc.*, 2005 WL 2095104, at *8 (S.D. Tex. Aug. 30, 2005) (finding no joint employment relationship between a general contractor and demolition subcontractor where the general contractor supervised the job site for safety practices and other problems, but did not control or directly supervise the details of the subcontractor's employee's work or their schedules).  Here, Polygon's insistence that JC Builders' immediately respond to requests of Polygon superintendents blurred the line between JC Builders as an independent contractor and JC Builders as a source of "manpower" for Polygon.

### e.       Comparison with Other Cases

Further, the type of supervision and resulting indirect control present here is more similar to cases where courts have found a joint employment relationship, like *Torres-Lopez*, than cases where no such relationship existed, such as in *Moreau, Jacobson,* and *Zhao*.

In *Moreau*, discussed at length above, the Ninth Circuit placed considerable emphasis on the qualitative difference between Air France's supervision of ground handlers to ensure compliance with safety and security regulations and the farmer's supervision of pickers in *Torres-Lopez.*  Polygon argues that, like the airlines industry, the construction industry requires strict compliance with building plans and codes for safety purposes, which Polygon ensured

through its ongoing supervision.  Lemus notes that the typical framing changes requested by Polygon were not strictly safety-related, such as correcting the height of door openings or replacing imperfect lumber.  But even if the changes were all safety-related, this case differs from *Moreau* in one important respect.  Unlike in *Moreau*, where Air France monitored ground contractors' performance on a regular basis but only communicated with those contractors once a month about potential problems, *see Moreau,* 356 F. 3d at 949, here Polygon had at least daily interaction with JC Builders about its employees' work, leading to much more pronounced control of JC Builders' daily activities.

The same distinction is apparent in *Jacobson v. Comcast*.  There, Comcast contracted with cable installation companies, which, in turn, hired technicians to install cable equipment in customers' homes.  *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 686 (D. Md. 2010).  The Court held that Comcast did not jointly employ the technicians, despite Comcast issuing technicians Comcast ID badges, retaining the power to effectively fire them by deauthorizing them as Comcast contractors, at times directing technicians to specific work sites, and engaging in real-time monitoring of technician's work through a computer program that tracked their arrival time, their time on site, and what equipment they used.  *Id.* at 687, 693-694.  Importantly, however, while Comcast collected data on technicians in real time, they apparently used the data to review technicians' performance on a monthly basis to determine if certain technicians should be deauthorized, not to micro-manage technicians' daily activities.  *See id.*, at 687.

Similarly, the level of quality control here is different than in *Zhao v. Bebe Stores*.  There, plaintiff was a garment worker employed by Apex Clothing, a company sewing garments for

clothing manufacturers, including Bebe Stores. *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1155 (C.D. Cal. 2003). Bebe Stores' quality control personnel inspected garments at Apex "at the beginning, middle, and end" of the assembly process and even had one quality control manager with an office onsite at Apex to deal with quality control issues as they arose. *Id.* at 1155, 1160. Nevertheless, the court found that "the record falls short of demonstrating that this involvement could be properly characterized as control or supervision over Apex's employees." *Id.* at 1160. Although this level of supervision and intervention is somewhat similar to Polygon's Quality Assurance program, which scrutinized work at predetermined points in the construction process, it is quite unlike the daily supervision of JC Builders' framing by Polygon.

The level of control Polygon exerted here is more similar to the farmer's control in *Torres-Lopez*. Just as in *Torres-Lopez*, Polygon dictated the overall work schedule of JC Builders' workers and the hours during which they were permitted to work, maintained a frequent presence at the work site, and retained the right to inspect work both while it was being done and after it was finished. Admittedly, unlike in *Torres-Lopez*, where the farmer regulated how many pickers were needed by staggering planting dates, Polygon did not dictate how many framers JC Builders should provide. Nevertheless, Polygon's daily supervision and oversight favors a conclusion that it was a joint employer.

### 3.    Rate and Method of Payment

The third *Bonnette* factor also supports finding a joint employment relationship. There is no dispute that JC Builders generally determined its employees' rate of pay and managed all its own payroll. Charpentier required his employees to sign piecework agreements setting pay

according to the size of the buildings they framed.  (Poore Decl., #69, Ex. B., at 11-12)

(Charpentier Dep.).  JC Builders paid its employees every two weeks, by paycheck, but allowed

workers to sign their checks back to JC Builders for cash so they would not have to waste a

percentage of their income at check-cashing agencies.  *Id.* at 15-16.  Contract CPA Yasmine

Caldwell managed JC Builders' payroll and issued W-2s to employees, under direction from

Charpentier.  *Id.* at 16; (Poore Decl., #80, Ex. B, at 6-7) (Charpentier Dep.).

But even though JC Builders' dictated its employees' compensation rate and managed its

own payroll, Polygon also shared significant power in determining the manner in which JC

Builders were paid.  JC Builders' subcontract gave Polygon the right to pay unpaid wages

directly to JC Builder employees and deduct those payments from amounts otherwise due to JC

Builders.  (Henretty Decl., #66, Ex. 1, at 6) (¶ H.5(l)).  And, at one critical point, Polygon

actually issued JC Builders an advance payment to ensure that JC Builders' employees' wages

were paid.

Polygon supervisors were generally interested in whether subcontractor's employees were

being paid, since workers not being paid could effect their workmanship and slow progress on a

project.  (Henretty Decl., #66, Ex. 3, at 12-14) (Ingerbrigsten Depo).  Therefore, Polygon

expected superintendents to report to their superiors what they heard about subcontractor's

employees being paid, although Polygon superintendents did not actively try to find out whether

those employees were being paid.  *Id.*  In late May 2009, Polygon deviated from its passive

stance towards JC Builders' payment of workers and began to intervene.  As described above,

Polygon advanced JC Builders over $100,000 so that it could meet its obligations to employees

Page 27 - FINDINGS AND RECOMMENDATION

and vendors.  Polygon insists that this early payment was simply an attempt to avoid paying for the same work twice, once to JC Builders and again to JC Builders' employees if they filed labor liens against the project.  This may have been one facet of Polygon's decision-making.  But the "economic reality" of this large-scale construction project featuring over 50 different specialized trades working on a strict master schedule suggests Polygon also advanced JC Builders payments to keep JC Builders' workers from walking off the job.  Indeed, this concern eventually became reality in July 2009 when JC Builders employees failed to show up for work at the Timberland Apartments job site and Polygon cancelled JC Builders' subcontract.

None of the relevant cases involve a situation such as this where a putative joint employer makes an additional payment to a subcontractor after learning that the subcontractor's employees were not being paid.  This intervention clearly does not imply the same amount of involvement as a contractor who negotiates pay rates with subcontractor's employees and pays them directly, as in *Chao*, 709 F. Supp.2d at 1062-1063, or one who increases subcontractor's pay for more difficult work, *Torres-Lopez*, 111 F.3d at 643.  But, focusing on the touchstones of the "economic reality" and "economic control" as the Ninth Circuit did in *Bonnette*, both Polygon's subcontract with JC Builders and Polygon's advance to JC Builders suggests that Polygon yielded significant economic control over whether JC Builders' workers were paid.  Thus, this factor favors finding a joint employment relationship.

### 4.    Employment Records

Although the parties do not focus much on this factor, it also weighs slightly in Lemus' favor.  JC Builders owner testified that initial employment paperwork for employees would be

provided to JC Builders project leads and in conjunction with other records such as pay stubs would be kept in JC Builders' offices in Puyallup, Washington.  (Poore Decl., #69, Ex. B, at 15-16).  Thus, in the normal course of business, Polygon did not maintain employment records for JC Builders employees.  Yet, as described above, in late May 2009, Polygon requested and collected lien releases for all JC Builders employees documenting the fact that each had been paid.  Polygon describes these lien releases as mere "financial documents."  But because these documents detailed JC Builders  employees' individual hours and wages, they amounted to a rough duplicate of JC Builders' payroll records.  Morever, starting in June 2009, when some of JC Builders employees stopped showing up for work, Polygon asked its site superintendents to track JC Builders' manpower on a daily basis.  (Poore Decl., #80, Ex. A, at 6-8) (Walther Dep.)  Polygon requested that tracking to prepare for discussions with JC Builders' management about future construction schedules.  By collecting the equivalent of JC Builders' payroll information and tracking how many workers it had on the job, Polygon differentiated itself from a typical general contractor, who has no access to subcontractor employment records.

### D.     Applying the *Torres-Lopez* Factors

#### 1.     Akin to Specialty Job on Production Line

Whether work is a "specialty job on the production line," *Rutherford*, 331 U.S. at 730, depends on whether it is "part of the integrated unit of production," *id.* at 729, not whether it requires any particular level of skill.  *But see Gonzalez*, 2010 WL 187620, at *6-7 (reasoning that construction framers did not perform a specialty job on the production line because, unlike the boning beef in *Rutherford*, the framers' work could be learned in just a few days).  In *Rutherford*,

the Supreme Court addressed whether a subcontracted group of skilled beef boners who worked

in a slaughterhouse were also employees of the slaughterhouse under the FLSA.  In ultimately

holding that the beef boners were employees of the slaughterhouse, the Court noted that "the

workers did a specialty job on the production line." *Rutherford*, 331 U.S. at 730.  This

conclusion was reinforced by the fact that "[t]he slaughterhouse operations, of which the boning

is a part, are carried on in a series of interdependent steps." *Id.* at 725.  Indeed, when applying

this factor in *Torres-Lopez*, the Ninth Circuit likewise focused on whether the farmworkers'

labor "constituted one small step in the sequence of steps" taken by the farmer to create his final

product, not whether the farmers workers' tasks required significant skills.  *Torres-Lopez***,** 111

F.3d at 643.

      Here, there is no dispute that framing is one of the 50 specialty trades Polygon used in

completing its projects.  And even though there was no literal "production line" in constructing

buildings, the framers fulfilled one necessary step in the linear process of constructing the

buildings that comprised the Timberland Apartments project.  Thus, like the cucumber pickers in

*Torres-Lopez* and the beef boners in *Rutherford*, Lemus' framing work can be considered akin to

a speciality job on a production line.  This conclusion supports the notion that Polygon is a joint

employer.

### 2.      Responsibility Under Contracts Pass to Another Labor Contractor Without Material Changes

      JC Builders accepted Polygon's subcontract for the Timberland Apartments project

without material changes.  According to Charpentier, JC Builders was offered the subcontract as

a "take it or leave it" offer without the possibility for negotiation, with the total contract price based on a square-foot price set by market value.  (Henretty Decl., #66, Ex. 5, at 9-10.)  Indeed, the Polygon employee who negotiated the subcontractor agreements with JC Builders stated that "the general terms and conditions cannot be altered; we're not allowed to do that at all." (Henretty Decl., #66, Ex. 7, at 8-9) (Baker Dep.)   Indeed, only two clauses were crossed out in the subcontract– those pertaining to priming and painting end cuts of fascia and barge material and supplying end cut solution– and both were relatively minor.  (Poore Decl., #80, Ex. B at 20-22.)

Polygon notes, however, that *after* JC Builders' contract was terminated, the contract actually underwent significant changes.  Instead of paying a flat rate based on square footage of the buildings, as it did with JC Builders, Polygon hired the subsequent framing subcontractor on a time and materials basis for "framing pick up work."  (Poore Decl., #94, Ex. B at 8) (¶ H.1). This subcontractor completed and corrected JC Builders' unfinished work at a much higher overall pay rate.  (Erickson Decl., #70, ¶6.)   Thus, although initially the subcontract was passed to JC Builders without material changes, it was later altered significantly after JC Builders' termination.  Accordingly, this factor weighs against the conclusion that Polygon jointly employed workers of JC Builders.

### 3.    Employer's Premises and Equipment Used

There is no dispute that Polygon, as both developer and general contractor, owned the premises where JC Builders employees worked.  Polygon, however, did not provide equipment for Lemus and other laborers.  JC Builders provided its own forklift, saws, nail guns, air

compressors, routers, levels and miscellaneous other tools, while JC Builders' employees provided their own hammers, speed squares, measuring tapes, chalk lines, and pouches to hold their tools. (Henretty Decl., #86, Ex. 1, at 14-15) (Charpentier Dep.)  Courts have recognized that ownership of the premises is an important factor in the overall analysis "because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors . . . ." *Antenor v. D & S Farms*, 88 F.3d 925, 937 (11th Cir. 1996).  Given the importance of ownership of the work site in preventing labor violations, this factor weighs in favor of a joint employment.

### 4.    Employees Have Business Organization that Could or Did Shift as a Unit to Other Work Sites

Although JC Builders possessed the structure of an independent business organization, it was so dependent on Polygon for contracts and stretched beyond its capacities in attempting to meet those obligations that it was not independently viable, and thus not able to shift Lemus or his co-workers to other work sites.  The constant turnover of JC Builders employees at Polygon projects suggests that JC Builders did not have a core group of its own employees that could move to other sites.  Moreover, JC Builders relied predominantly on Polygon as the single source of its business.  JC Builders was dependent on Polygon projects for 85% of its income, and while working on the Polygon contracts, JC Builders sent crews to only two other jobs that did not involve Polygon projects.  (Chatelaine Decl., #88, ¶15) ; (Henretty Decl., #92, Ex. 3, at 11) (Charpentier Dep.)  Further, after JC Builders stopped working for Polygon, it took on only one other small job before ceasing its activities.  (Henretty Decl., #92, Ex. 3, at 45, 50.)  Perhaps even

more importantly, Lemus only worked on the Timberland Apartments project while employed by JC Builders and it appears that his co-workers likewise did not shift to other work sites. (Lemus Decl., #87, ¶¶3-4).

In *Gonzales*, where two of the plaintiffs worked together on only one additional job after leaving the putative joint employer's work site, Judge Brown reasoned that there was no evidence from which a jury could conclude that plaintiffs "acted regularly as a business organization that shifted from one worksite to another." *Gonzales*, 2010 1875620, at *7. Here, the same reasoning applies, perhaps even more strongly. Lemus and his co-workers worked only on the Timberland Apartments project and, unlike in *Gonzalez*, never worked together again after that project. In sum, JC Builders' overwhelming economic reliance on Polygon, its lack of a stable workforce, its quick disintegration after losing the Polygon contracts, and its use of Lemus and others exclusively at Polygon's work site indicate that this factor favors a joint employment relationship.

### 5.    Piecework Not Requiring Initiative, Judgment, Foresight, or Special Skill.

Lemus and other JC Builders employees labored under piecework agreements that yielded wages from the minimum wage to $10 per hour. (Henretty Decl., #86, Ex. 1 at 26) (Charpentier Dep.) Lemus exercised no managerial authority and his work was that of a low-skilled laborer. (Lemus Decl., #87, ¶2); (Henretty Decl., #66, Ex. 5, at 15-16.) Polygon argues that this factor and the next do not apply well to this case, since Lemus worked for JC Builders, which itself set Lemus' pay and exercised managerial judgment. This argument is unpersuasive. *Rutherford*, the

case from which this non-regulatory factor derives, describes beef boning as work that "was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." *Rutherford*, 331 U.S. at 730. Thus, the focus is properly placed on the nature of work done by the putative joint employee, not that employee's manager. Here, Lemus work was unskilled– carrying lumber and hammering nails into predesigned holes in brackets and clips. (Poore Decl., #69, Ex. B, at 8-10) (Charpentier Dep.). This factor weighs in favor of a joint employment relationship.

### 6.    Employee Has Opportunity for Profit or Loss Depending on Managerial Skill

It is undisputed that Lemus' piecework agreement did not afford the opportunity for profit or loss depending on managerial skill. Thus, this factor also favors finding a joint employment relationship.

### 7.    Permanence in the Working Relationship

Lemus argues that even though he only worked at the Timberland Apartments site from April 21 to June 17, 2009, the court should apply the "relative permanence" standard used by the Fifth and Seventh Circuit, which deems work of even short duration to be permanent if it is exclusive for the length of the relevant season. *See Brock v. Mr. W. Fireworks*, 814 F.2d 1042, 1053-54 (5th Cir. 1987); *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987). In *Gonzalez*, Judge Brown explicitly rejected this "relative permanence" standard, reasoning that the cases endorsing that standard did not involve construction work and that those cases required a recurring, seasonal working relationship, which was not present on the facts in that case. Yet

the Fifth Circuit, at least, recognizes that recurring employment is not required: "the proper test

for determining permanency of the relationship is not whether the alleged employees returned

from season to season, but whether the alleged employees worked for the entire operative period

of a particular season." *Brock*, 814 F.2d at 1054. Nevertheless, even if I were inclined to follow

the Fifth Circuit's relative permanence standard for seasonal work, I would have no reason to

apply it in this case, since residential construction is not a seasonal industry. (Erickson Decl.,

#82, ¶3.) Since Lemus' two-month relationship with Polygon was not permanent, this factor

weighs against a joint employment relationship.

### 8. Serviced Rendered Were An Integral Part of Employer's Business

Polygon argues that Lemus' contribution as a laborer was not integral to the construction

of Polygon's buildings because he was easily replaceable. Polygon misconstrues the meaning of

this factor, which focuses not on whether the employee had a unique talent but on whether the

service that the employee rendered, no matter how mundane, was necessary to the overall

business operation. *See Torres-Lopez*, 111 F.3d at 644 (picking cucumbers was integral to the

farmer's business because farmer could not realize any economic benefits of his investment in

the cucumbers without having them picked). Here, it cannot be disputed that framing is integral

to the construction process. *Cf. Gonzalez*, 2010 WL 1875620, at *8 (parties not disputing that

framing is an integral part of constructing homes). Thus, this factor weighs in favor of a joint

employment relationship.

### E. Balancing of All Factors

As described above, all four of the *Bonnette* factors and six of eight *Torres-Lopez* factors

favor a joint employment relationship.  Most important than even the mathematical tallying of factors for and against is the observation that in several key areas Polygon possessed significant control over JC Builders' employees and their work, creating a relationship that placed Polygon in the role of employer.  Polygon owned the job site, set work hours, reserved the right to fire JC Builders employees in limited circumstances, dictated the timing of delivery of JC Builder's necessary building materials, interrupted JC Builders' work forcing its employees to switch tasks mid-stream, reserved the right to pay JC Builders' workers wages directly, gave JC Builders an advance enable it to pay its workers on one occasion, and tracked whether JC Builders paid those wages.  *See Bonnette*, 704 F.2d at 1470 (putative joint employer "exercised considerable control over the nature and structure of the employment relationship").   Also, it is important that one area of Polygon's control– its power to pay wages and its intervention to ensure wages were actually paid– extends into a quintessential aspect of the employer-employee relationship, the payment of wages.

My finding today rests, of course, on the unique facts presented and does not imply that all developer/general contractors are joint employers of their subcontractors' employees.  Nor does it preclude general contractors from exercising the necessary level of supervision of subcontractors to ensure compliance with safety requirements and building specifications. Rather, based on a consideration of the totality of the circumstances and guided by the factors described in *Bonnette* and *Torres-Lopez*, I conclude that Polygon was Lemus' joint employer under the FLSA and Oregon wage laws.

**F.     Wages Owed**

Page 36 - FINDINGS AND RECOMMENDATION

Even after determining that Polygon is a joint employer as a matter of law, the court must still assess whether Polygon committed a FLSA violation and, if so, the measure of Lemus' damages. Polygon argues that there is at least a genuine issue of material fact concerning whether Lemus already received all the wages he was due. I disagree.

The FLSA and Oregon law require an employer to pay minimum wages and overtime wages. 29 U.S.C. §206(a)(1) (federal minimum wage requirement); 29 U.S.C. § 207(a)(1) (federal overtime wage requirement); Or. Rev. Stat. § 653.025 (Oregon minimum wage requirement); Or. Rev. Stat. § 653.261( Oregon overtime wage requirement). Lemus declared that he worked 426 hours at the Timberland Apartments projects, including 76 overtime hours, but was paid only $1,313.00 for 128 hours of work. (Lemus Decl., #87, ¶¶5,6.) That payment amounts to approximately $3.08 per hour for the hours he worked, well below the 2009 federal minimum wage of $6.55 and the 2009 Oregon minimum wage of $8.40. After Lemus stopped working for JC Builders, he also received $200 towards his unpaid wages and another $3,500 in settlement of this suit. (Lemus Decl., #87, ¶¶9,10.) Thus, under Oregon minimum wage laws, Lemus argues that he should have received at least $3,897.60 for his work at Timberland Apartments, comprised of 350 hours at $8.40 per hour plus 76 overtime hours at $12.60 per hour. In addition, Lemus contends that he is owed penalty wages of $2,016 under Oregon law, corresponding to 30 days of eight hours each at $8.40 per hour. *See* Or. Rev. Stat. §§ 653.055, 652.150. Summing Lemus' wages earned ($3,897.60) and the penalty wage ($2,016) and subtracting the wages he received during his employment ( $1,313) and the money received since his employment ($3,700), yields a total of $900.60 still owed to Lemus on his Oregon claims for

unpaid wages and penalty wages.

Polygon argues that testimony by JC Builders' owner creates a factual dispute about the amount of wages Lemus actually received from JC Builders during his employment.  Charpentier testified that, based only on a spreadsheet prepared by JC Builders' general manager Pierre Chatelaine and presented as a deposition exhibit, Lemus appeared to have received a draw of $537.60 and was owned only $102.40 in additional wages. (Henretty Decl., #92, Ex. 3, at 59) (Charpentier Dep.).  However, Charpentier could not say whether or not Lemus actually received that draw without finding the documentation of that payment in JC Builders' archives.[10]  *Id.* at 60.  In fact, he said the spreadsheet merely "speculates that [Lemus] was paid $537.60." *Id.*

Charpentier's testimony cannot create a genuine issue of fact as to the amount of Lemus' owed wages for two reasons.  It is both self-serving, since the spreadsheet suggested JC Builders paid Lemus more wages than Lemus reported, and altogether speculative, since Charpentier lacked any personal knowledge of JC Builders paying a draw to Lemus.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (uncorroborated and self-serving testimony will not create a genuine issue of material fact); *Anheuser–Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995) (conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment).

Defendants also attempt to create a question of fact by pointing to Charpentier's testimony that, based on Lemus' piecework agreement, he was owed approximately $1,300, an amount that would have been adequately covered by receiving a check for $1,313 plus a draw of

---

[10] It appears that neither party has accessed these archives.

over $500. (Poore Decl., #80, Ex. B at 16.)   That conclusion is of little use, however, because

that particular piecework agreement only covered work done by Lemus in April 2009, while the

undisputed evidence shows Lemus worked until mid-June 2009.  (Poore Decl., #80, Ex. B at 16);

(Lemus Decl., #87, ¶5.)   Thus, the only evidence properly before the court on summary

judgment indicates Lemus is still owed $900.60 in unpaid wages and penalty wages.

## CONCLUSION

For the foregoing reasons, Lemus' motion to amend (#59) should be granted as to its

removal of Polygon Northwest as a defendant but otherwise denied.  Lemus' motion for partial

summary judgment (#62) should be granted as to defendant Timberland Apartments, but denied

as to WR Townhomes F.  Defendants' motion for summary judgment (#67) should be granted as

to WR Townhomes F but denied as to Timberland Apartments.  Judgment should be entered

dismissing Polygon Northwest as a defendant without prejudice and dismissing WR Townhomes

F as a defendant with prejudice.  Additionally, judgment should be entered in favor of plaintiff

against Timberland Apartments in the amount of $900.60.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any,

are due fourteen (14) days from service of the Findings and Recommendation.  If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

//

//

//

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 21st day of December, 2011.

_/s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge

Page 40 - FINDINGS AND RECOMMENDATION